Frederick CLAY, Petitioner,

v.

George VOSE, Respondent.

Civ. A. No. 83–4034–K.

United States District Court,
D. Massachusetts.

Dec. 31, 1984.

Thomas G. Shapiro, Shapiro & Grace, Boston, Mass., for petitioner.

Frances Robinson, Asst. Atty. Gen., Boston, Mass., for respondent.

## Opinion

KEETON, District Judge.

Petitioner Frederick Clay, now in the custody of the Commonwealth at the Massachusetts Correctional Institute in Norfolk, has filed a petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254 (1982). Clay is seeking relief from a 1981 state court conviction for first degree murder, which resulted in a sentence of life imprisonment. Clay argues that testimony identifying him at trial, given by a witness who had been interviewed under hypnosis before trial, was so inherently untrustworthy and unreliable that the admission of the testimony denied him due process of law under the Fourteenth Amendment. Also he argues that hypnosis left the witness invulnerable to effective cross-examination, thus violating his Sixth Amendment right to confrontation of witnesses, applicable to state criminal proceedings through the Fourteenth Amendment. *Pointer v. Texas*, 380 U.S. 400, 85 S.Ct. 1065, 13 L.Ed.2d 923 (1965). The Commonwealth has moved to dismiss the petition, arguing that the petitioner has failed to exhaust his state remedies and has failed to state a claim of constitutional dimension. I conclude that Clay has exhausted his state remedies and therefore his claims are properly before this court. I conclude further that Clay's right to confrontation was not violated by a ruling that permitted his conviction to stand even though the jury was permitted to hear the identification testimony of a witness who had been "80 per cent" or "pretty sure" when he identified a photograph of petitioner among a non-suggestive array of twelve photographs before hypnosis and was "100 per cent" sure of the identification after hypnosis. Finally, I conclude that the identification of Clay at trial did not violate Clay's due process rights. Accordingly, the petition for a writ of habeas corpus will be denied.

## I. *Facts and Previous Proceedings*

According to the testimony of the hypnotized witness, Richard Dwyer, he was seated in a taxicab on Washington Street at about 4:00 a.m. on November 16, 1979, parked immediately behind ITOA taxicab No. 649. He saw three young men, two tall and one short, cross the street toward him and enter cab No. 649. The three had first approached Dwyer's cab, but he did not like their looks and declined to give them a ride.

Other evidence offered by the Commonwealth supported findings that the taxicab was operated by Jeffrey Boyajian, that a few minutes later Boyajian was killed by gunshots outside his taxi on Brookway Terrace in the Archdale Housing Project in the Roslindale section of Boston, and that Clay and his co-defendant, James Watson, were identified by a witness who observed the incident from the window of an apartment in the project.

Later that day, after learning of the death of the driver of cab No. 649, Dwyer called the police, went to a police station, and gave a somewhat vague description of the three men. Detective Henry Berlo asked Dwyer if he would be willing to undergo hypnosis to improve his memory of the men, and Dwyer agreed. Before the hypnosis Berlo showed Dwyer a group of twelve photographs of black males who lived in the Archdale Housing Project, where the body of Jeffrey Boyajian was found. The trial judge, who ruled on petitioner's motion to suppress, found that the pictures appeared to constitute a fair photographic array and that there was no evidence that Berlo or any other police officer attempted to influence Dwyer as he examined the photographs (Petition for Habeas Corpus, Appendix ("App."), p. 18). Dwyer positively identified one of the photographs, that of James Watson, as one of the three men he had observed entering the

taxicab. He then picked out a second photograph, that of petitioner Clay, and said he was "pretty sure" it depicted another of the three men. Dwyer said his certainty in identifying Clay, on a scale of one to ten, was "somewhere around an eight." He was unable to identify the third young man (App. 17–19).

After Dwyer finished looking at the photographic array, Berlo introduced him to Detective Patrick Brady, who had previously not been present. Brady, the director of the Boston Police Hypnosis Investigation Unit, was found by the trial judge to be a qualified investigator in the field of forensic hypnosis. (App. 19).

Brady and Dwyer talked with each other for approximately ten to fifteen minutes. This conversation was not recorded. At the moment he began to induce hypnosis, Brady turned on a tape machine to record the session. Brady hypnotized Dwyer, using the so-called "TV-technique." He told Dwyer that Dwyer was viewing a television screen at home, and that he would see a "documentary" of the events he had seen the previous morning on Washington Street. The trial judge found that Dwyer was somewhat better able to describe the clothing on the three men, but was not able to describe their facial characteristics in any more detail. Detective Berlo, two other police officers, and three assistant district attorneys were present at the hypnotic session.

After the hypnotic session had terminated, Brady spoke to Dwyer for a few minutes and then departed. Berlo then showed Dwyer the photographic array once again. Dwyer this time made a positive identification of both Watson and Clay. He was again unable to make a photographic identification of the third young man.

Brady conducted a second hypnotic session with Dwyer on November 27, 1979. Detective Berlo and another police officer were in the room. This second session elicited only a little more information. Dwyer was again unable to identify the third young man. The trial judge found that Dwyer's description and identification

of petitioner remained the same after the second session as before it. (App. 25).

At trial, the court received evidence of Dwyer's in-court identification of Watson and Clay and his pretrial identification of photographs of Watson and Clay, together with evidence of Dwyer's increase of confidence in his identification of Clay after hypnosis. The jury also heard extensive testimony concerning the hypnotic sessions, including a tape recording of each session. They heard conflicting expert testimony about hypnosis from Dr. Martin Reiser, who testified for the Commonwealth, and from Dr. Martin Orne, petitioner's expert. As the Massachusetts Supreme Judicial Court concluded, the jury was given a full opportunity to assess the possible effects of hypnosis on Dwyer's testimony; possible weaknesses in the hypnotic procedures used were fully aired before the jury. *Commonwealth v. Watson*, 388 Mass. 536, 541–42, 447 N.E.2d 1182, 1185–86 (1983).

The Commonwealth's chief additional witness against petitioner was Neil Sweatt, who lived on Brookway Terrace in the Archdale Housing Project. Sweatt testified that at 4:20 a.m. on November 16, 1979, he looked out a parlor window in his apartment and saw Watson, Clay, and a third man pull Boyajian from the taxicab. Sweatt recognized Clay, whose first name he knew, from seeing him around the neighborhood. Sweatt testified that he saw Clay go through Boyajian's pockets while Watson held him. He saw the three men beat up Boyajian. Sweatt's view of what happened next was partially blocked by a dumpster, but he eventually saw petitioner reach into his belt or a pocket and bring his left arm across his body. Sweatt testified that he then heard at least three shots, at which point the men ran away. Parts of Sweatt's testimony, but not the identifications, were corroborated by his mother and a friend, each of whom was looking out the parlor window. The jury also heard testimony that Sweatt initially told police he had not seen anything and could not identify any of the photographs shown to him by police, including those of

Watson and Clay. The jury also heard testimony that Sweatt initially told police he had not seen anything and could not identify any of the photographs shown to him by police, including those of Watson and Clay. The jury heard testimony that the Sweatts were the only white family living in the project at the time. It heard testimony that Detective Berlo said he would arrange to move the family if Sweatt cooperated and that Sweatt subsequently identified the photographs of Watson and Clay.

The trial judge, in ruling on Clay's motion to suppress Dwyer's testimony, found that there was no evidence that Sweatt's identification was suggestive or improper, and the identification thus constituted independent corroboration of Dwyer's identification (App. 24). The judge denied petitioner's motion to suppress, but did instruct the jury to consider the influence of hypnosis on Dwyer's testimony. The jury found both Watson and Clay guilty of murder in the first degree.

On appeal, the Massachusetts Supreme Judicial Court affirmed Clay's conviction. *Commonwealth v. Watson*, 388 Mass. 536, 447 N.E.2d 1182 (1983). The court concluded that Clay was not prejudiced by the admission of testimony concerning Dwyer's post-hypnotic positive identification of Clay's photograph or by Dwyer's in-court identification of Clay. *Id.* at 542, 447 N.E.2d at 1186. In the view of the Supreme Judicial Court:

> The process of hypnotizing Dwyer produced no new evidence against either defendant. We are, therefore, not dealing with what we have called hypnotically aided testimony. We are, however, dealing with the fact that hypnosis apparently enhanced Dwyer's confidence in his identification of Clay.

*Id.* at 541, 447 N.E.2d at 1185. The court noted that the prosecutor, in his closing argument, asked the jury to disregard Dwyer's post-hypnotic certainty and only to use Dwyer's pre-hypnotic identification as corroboration of Neil Sweatt's testimony. *Id.* at 542, 447 N.E.2d at 1186. The court concluded, considering the entire record, that Clay was not prejudiced by Dwyer's testimony.

## II. *Exhaustion of Remedies*

The Commonwealth initially argues that petitioner did not present in state courts his claim of violation of his Sixth Amendment right to confrontation. Therefore, it argues, Clay's petition for habeas corpus should be dismissed as involving both exhausted and unexhausted claims. *Rose v. Lundy*, 455 U.S. 509, 510, 102 S.Ct. 1198, 1199, 71 L.Ed.2d 379 (1982).

In order for a prisoner to obtain relief in the federal court on the basis of alleged constitutional infirmities in his state conviction and subsequent confinement, he must first have presented all of his federal claims in the state courts. 28 U.S.C. § 2254(b) and (c) (1982).

The Commonwealth argues that the conclusion that petitioner has not satisfied the exhaustion requirement is mandated by the First Circuit's holding in *Lacy v. Gabriel*, 732 F.2d 7 (1st Cir.), *cert. denied*, ─── U.S. ───, 105 S.Ct. 195, 83 L.Ed.2d 128 (1984). The First Circuit there stated:

> While each legal theory presented to the federal courts need not have been presented in precisely the same fashion to the state courts, a claimed denial of the benefit of a specific provision of the Bill of Rights, such as the sixth amendment right to confrontation, involves not only a different section of the Constitution but a mode of analysis which may be significantly different from a challenge based on more general due process grounds.

*Id.* at 11, *citing Donnelly v. DeChristoforo*, 416 U.S. 637, 643–44, 94 S.Ct. 1868, 1871–72, 40 L.Ed.2d 431 (1974).

In the present case, petitioner's initial motion to suppress Dwyer's testimony asserted only a Fourteenth Amendment due process claim (App. 11). But the apparent similarity to *Lacy* disappears as one examines the record in the present case more closely. The trial judge, in denying the motion to suppress, recognized that one of Clay's allegations was "that the admission

of hypnotically aided testimony in the present case would violate the defendant's constitutional rights of due process and his rights to confront his accusers." (App. 14). In a lobby conference with the attorneys in the case, the trial judge stated that "the overriding consideration in hypnosis is the constitutional right of confrontation and the suggestibility of people that are under it." (Trial Transcript ("Tr.") Vol. 5:180). Petitioner's brief to the Supreme Judicial Court argued that "the hypnotized witness' subjective certainty in the truth of his memory makes him invulnerable to cross-examination" and cited several decisions supporting the proposition that the admission of hypnotically aided testimony violates a defendant's right to confrontation. Brief of Defendant-Appellant at 79–80. The Commonwealth, in its brief on appeal, stated that Watson and Clay were arguing that admission of Dwyer's testimony "violated their constitutional rights of due process and confrontation of witnesses." Brief of Commonwealth at 50–51. Finally, in his reply brief, Clay argued that "the admission of any testimony by the hypnotized witness Richard Dwyer would violate the defendant's Fourteenth Amendment rights to due process of law and the confrontation of witnesses." Reply Brief at 1. Although petitioner did not specifically refer to the Sixth Amendment, he correctly notes that the Sixth Amendment right to confrontation is not directly applicable in a state prosecution, but applies through the Fourteenth Amendment. *See Pointer v. Texas*, 380 U.S. 400, 85 S.Ct. 1065, 13 L.Ed.2d 923 (1965). Petitioner thus fairly presented the substance of his right to confrontation claim to the state courts, and alerted the courts to the federal nature of the claim. *See Anderson v. Harless*, 459 U.S. 4, 6, 103 S.Ct. 276, 277, 74 L.Ed.2d 3 (1982) (per curiam).

Fully examined, *Lacy* is easily distinguished from the present case. There, the petitioner argued in the state courts that a juror's conduct in improperly peeling off tape from two exhibits violated his right to due process under the Fourteenth Amendment. Neither in the state courts nor in his federal petition did petitioner argue

that such conduct violated his Sixth Amendment right to confrontation. The district court thought the issue was properly analyzed under that constitutional provision, and ordered the parties to brief and argue the issue. *Lacy*, 732 F.2d at 8. The First Circuit held that the district court erred in finding the right to confrontation and due process claims indistinguishable, and ruled that petitioner had not exhausted his Sixth Amendment claim. *Id.* at 10–11. Lacy had not presented his Sixth Amendment claim in the state courts because it was analytically different from the only due process claim Lacy had asserted in the state courts. In fact, the First Circuit declined to dismiss Lacy's entire petition as a mixed one, in part because Lacy argued the Sixth Amendment claim only after the district court ordered him to do so. *Id.* at 11–12. Here, in contrast, petitioner raised his right to confrontation claim on his own in the state courts. His repeatedly designating it as a "right to confrontation" claim was sufficient to alert the state courts to its basis in the Sixth Amendment, by incorporation through the Fourteenth.

Also distinguishable is *Dougan v. Ponte*, 727 F.2d 199 (1st Cir.1984). There, the petitioner argued that he satisfied the exhaustion requirement, and raised his constitutional objections to the conduct of his state trial, simply by including the words "unfair trial" in the issues captions of his state court brief. He made no reference to any constitutional provision or to any specific right and cited no cases which rested on constitutional grounds. The First Circuit concluded that the claims had not been exhausted because "the most meticulous search on the part of the state court would have turned up nothing suggesting that petitioner was making a federal due process argument." Id. at 202. The court cited with approval the exhaustion requirements spelled out in *Daye v. Attorney General of the State of New York*, 696 F.2d 186 (2d Cir.1982) (en banc), *cert. denied*, —— U.S. ——, 104 S.Ct. 723, 79 L.Ed.2d 184 (1984), in which the Second Circuit stated that a petitioner could satisfy the exhaustion requirements by citing a

specific provision of the Constitution, presenting the substance of a federal constitutional claim in such a manner that it "must have been likely to alert the court to the claim's federal nature," *id.* at 192, relying on federal constitutional precedents, and claiming the deprivation of "a particular right specifically protected by the Constitution," *id.* at 193. The First Circuit stressed that

> [w]here a habeas corpus petitioner's only basis for contending that he has exhausted state remedies is the citation of state or federal authorities employing constitutional analysis such authorities must play a prominent part in his state court argument. This being so, the only safe course for a petitioner is explicitly to identify his federal constitutional claims before the state court.

*Dougan,* 727 F.2d at 202. Unlike petitioner in *Dougan,* who made only a general claim of an "unfair trial" before the state courts, petitioner here specifically raised his right to confrontation claim in the state courts. As the Second Circuit noted in *Daye,* "[t]he more specific the description of the right in question . . . the more easily alerted a court will be to consider a constitutional complaint couched in similarly specific terms." *Daye,* 696 F.2d at 193.

More nearly analogous to the present case is *Dyer v. Ponte,* 749 F.2d 84 (1st Cir. 1984). Dyer made two references to the Fourteenth Amendment in his main brief to the Massachusetts Supreme Judicial Court, attacking the state trial judge's allegedly improper instructions to the jury on the law of joint enterprise. The petitioner also argued several times in his reply brief that the instructions violated his right to due process. The First Circuit expressed "doubts about whether these cursory references to the Fourteenth Amendment and due process were sufficient to raise the constitutional issue before the Supreme Judicial Court." *Id.* at 86. The court noted that "Dyer cited no federal cases in his state court brief and made virtually no federal argument, in sharp contrast to his extensive discussion of the issue under state law." *Id.* at 86. It stated that Dyer's case "comes close to implicating

*Dougan,*" *id.* at 86, though it noted that petitioner's explicit reference to the Fourteenth Amendment appeared to satisfy the exhaustion requirements in *Daye.* Although the court decided to address Dyer's petition on the merits, it cautioned that "counsel would be well advised in the future not to rely on a passing reference to a constitutional provision without supporting federal argument and without citations to federal authorities." *Id.* at 87.

On its face, petitioner's case bears much similarity to *Dyer.* Clay's state court brief cited no federal cases in support of his confrontation clause claim. Based on review of the entire record, I nonetheless conclude that this case is distinguishable from *Dyer* and that petitioner "fairly presented" the substance of his Sixth Amendment claim to the state courts. *Anderson,* 459 U.S. at 6, 103 S.Ct. at 277. As noted earlier, Clay argued in his reply brief that the admission of Dwyer's testimony "violates the defendant's rights to due process and the confrontation of witnesses, as guaranteed by the Fourteenth Amendment to the United States Constitution." Reply Brief of the Defendant at 1. In a footnote to that argument, Clay stated:

> The defendant did not expressly refer to the Fourteenth Amendment in his main brief, but numerous cases are discussed and relied upon in that brief which relied on the constitutional rights to due process and confrontation of witnesses in holding the testimony of hypnotized witnesses inadmissible. The defendant wishes to leave no doubt but that he does rely upon these Fourteenth Amendment rights. The Commonwealth noted in its brief (at 51) that the defendants have argued the admission of Dwyer's testimony "violated their constitutional rights of due process and confrontation of witnesses." The defendant's motion to suppress expressly relied on these constitutional rights. (R. 11–13)

Reply Brief at 1. Such a statement specifically alerted the Massachusetts Supreme Judicial Court that petitioner's "right to confrontation" claim had its basis in the Sixth Amendment by incorporation through

the Fourteenth. The fact that petitioner failed to cite federal cases in his state court brief is not decisive. In fact, up to that time no federal court had held that the admission of testimony by a previously hypnotized witness raised confrontation clause problems. Moreover, the state court cases cited by petitioner in his main brief and referred to in the footnote quoted above did refer to federal constitutional law analogies.

The most troublesome factor bearing upon the exhaustion issue is that petitioner's counsel did not argue the Sixth Amendment claim before the state courts nearly as thoroughly as he argued state law claims. Failure to argue federal constitutional claims fully before a state court invites the court to take them less seriously and thus tends to disserve the interests of comity between state and federal courts emphasized in *Rose v. Lundy*, 455 U.S. at 518–20, 102 S.Ct. at 1203–4, in *Dougan*, 727 F.2d at 202, and in *Dyer*, 749 F.2d at 86–87.

▮ An appearance of relatively little emphasis upon federal law arguments must be evaluated, however, in light of the fact that counsel may reasonably have sought to persuade the state courts to reach an outcome more favorable to the defendant than federal law compels. Hope for that outcome has, of course, disappeared by the time an action in the federal court is commenced. Moreover, precedents establish that the exhaustion requirement is to be applied with a view to substance rather than form. The Supreme Court has required a federal habeas petitioner to "provide the state courts with a 'fair opportunity' to apply controlling legal principles to the facts bearing upon his constitutional claim." *Anderson*, 459 U.S. at 6, 103 S.Ct. at 277, *quoting Picard v. Connor*, 404 U.S. 270, 276–77, 92 S.Ct. 509, 512–13, 30 L.Ed.2d 438 (1971). In addition, the petitioner must have fairly presented the substance of his federal habeas corpus claim to the state courts. *Anderson*, 459 U.S. at 6, 103 S.Ct. at 277; *Picard*, 404 U.S. at 275, 277–78, 92 S.Ct. at 513. The exhaustion doctrine thus requires that a petitioner provide the state courts with all the facts supporting his constitutional claim and sub-

mit the same governing legal arguments he would make in the district court. On the other hand, the exhaustion doctrine is not so inflexible as to prohibit a petitioner from some reformulation of the claims and arguments presented in the state courts, since it requires only that the substance of a federal claim first be presented in the state courts. *Williams v. Holbrook*, 691 F.2d 3, 6 (1st Cir.1982), *citing Picard*, 404 U.S. at 278, 92 S.Ct. at 513.

▮ It is not decisive of petitioner's argument that the Supreme Judicial Court did not discuss his right to confrontation claim; he need not demonstrate that the state courts either addressed or decided any constitutional issues to satisfy the exhaustion requirement, so long as those issues were fairly presented. *Smith v. Digmon*, 434 U.S. 332, 333, 98 S.Ct. 597, 598, 54 L.Ed.2d 582 (1978) (per curiam); *Williams*, 631 F.2d at 8. Moreover, simultaneously with the release of its opinion in this case, the Massachusetts Supreme Judicial Court published another opinion placing state law constraints on use of hypnotically aided testimony. *See Commonwealth v. Kater*, 388 Mass. 519, 447 N.E.2d 1190 (1983). A fair reading of the two opinions is that the court considered that it was imposing constraints more severe than those required by federal law. Implicit is a considered rejection of petitioner's contention that his federally protected right to confrontation was violated.

▮ I conclude, based on an examination of the state court proceedings, that Clay's Sixth Amendment claim, though not as fully argued before the state courts as here, was sufficiently presented both in the trial court and on appeal so that the petition should not be dismissed for failure to satisfy the exhaustion requirement.

III. *The Commonwealth's Arguments Regarding "Findings" of the State Courts*

The Commonwealth argues that the Supreme Judicial Court made "findings" that the process of hypnotizing Dwyer produced no new evidence against Clay and that the

case thus did not involve hypnotically aided testimony but only evidence that hypnosis apparently enhanced Dwyer's confidence in his identification of Clay. The Commonwealth contends that these "findings" are supported by the record and therefore must be presumed to be correct under 28 U.S.C. § 2254(d) (1982). The Commonwealth further argues that, under § 2254(d), the Supreme Judicial Court's determination that "Clay was not prejudiced by the admission of testimony concerning Dwyer's post-hypnotic positive identification of Clay's photograph or by Dwyer's in-court identification of Clay," 388 Mass. at 542, 447 N.E.2d at 1186, must also be presumed to be correct. The Commonwealth thus concludes that this court must presume that Clay's conviction was not based on hypnotically aided testimony and that Clay's petition must be denied.

■ The presumption of correctness found in § 2254(d) applies to determinations of fact. Factual determinations made by state courts deserve a "high measure of deference," *Rushen v. Spain,* 464 U.S. 114, 104 S.Ct. 453, 456, 78 L.Ed.2d 267 (1983) (per curiam); *Sumner v. Mata,* 455 U.S. 591, 598, 102 S.Ct. 1303, 1307, 71 L.Ed.2d 480 (1982) (per curiam) and may be set aside by a federal court only if they lack "even 'fair support' in the record." *Marshall v. Lonberger,* 459 U.S. 422, 432, 103 S.Ct. 843, 850, 74 L.Ed.2d 646 (1983).

The § 2254 presumption of correctness plainly does not apply, however, to legal conclusions. Evaluation of the Commonwealth's arguments in this case depends upon an understanding of the distinction between findings of fact and conclusions of law. The distinction that § 2254 makes between law and fact is not necessarily the same as the distinction or distinctions made by Rules 52 and 56 of the Federal Rules of Civil Procedure. Indeed, there is reason to believe that the rules of decision differ for these different contexts. *Compare Sumner,* 455 U.S. at 597, 102 S.Ct. at 1306 (under § 2254, "the federal court may give different weight to the facts as found by the state court and may reach a different conclusion in light of the legal standard") *with Bose Corp. v. Consumers Union of*

*United States, Inc.,* —— U.S. ——, 104 S.Ct. 1949, 80 L.Ed.2d 502 (1984) (clearly erroneous standard of Rule 52(a) not applicable to reviewing determination of "actual malice" in defamation case; appellate court must exercise independent judgment) *and O'Neill v. Dell Publishing Co., Inc.,* 630 F.2d 685, 687 (1st Cir.1980) (issue of "substantial similarity" in copyright case is mixed question of fact and law to be decided on summary judgment only if reasonable persons could not differ about any factual element of the issue). In the context of habeas corpus proceedings, the Supreme Court has stated that factual issues involve "what are termed basic, primary, or historical facts: facts 'in the sense of a recital of external events and the credibility of their narrators....'" *Townsend v. Sain,* 372 U.S. 293, 309 n. 6, 83 S.Ct. 745, 755 n. 6, 9 L.Ed.2d 770 (1963), *quoting Brown v. Allen,* 344 U.S. 443, 506, 73 S.Ct. 397, 445, 97 L.Ed. 469 (1953) (opinion of Frankfurter, J.). This statement may be understood as implying that the evaluative application of a legal standard to the evidence in a particular case is not a fact finding—or at least not the kind of fact finding to which a federal court must defer under § 2254. Instead, this kind of determination may be regarded as a mixed question of law and fact involving "the application of legal principles to the historical facts of [the] case." *Cuyler v. Sullivan,* 446 U.S. 335, 342, 100 S.Ct. 1708, 1714, 64 L.Ed.2d 333 (1980). The Court explained in *Sumner* that the ultimate question of the constitutionality of a pretrial identification procedure is a mixed question of law and fact to which the presumption of correctness does not apply. The Court added, however, that the presumption applied to questions of fact underlying the ultimate question of constitutionality, such as whether witnesses had the opportunity to observe the crime or whether witnesses gave a detailed, accurate description. *Sumner,* 455 U.S. at 597, 102 S.Ct. at 1306.

Different from all these illustrations are determinations as to whether hypnosis is so deeply affected by risks of suggestibility that all post-hypnotic testimony on the sub-

ject matter of a hypnotically aided investigative interview is unreliable, and whether hypnosis has such a tendency to enhance confidence in pre-hypnotic memory that it should be held to violate the right to due process of law or confrontation of witnesses. Determinations of this kind are partly descriptive (or factual) and partly prescriptive or proscriptive. They are determinations on mixed questions of law and fact in a very broad sense, but not in the sense referred to in 28 U.S.C. § 2254. The factual elements in determinations of this kind are not findings on the facts of the particular case. They are neither findings of historical fact nor findings made by evaluative application of a legal standard to the evidence in the particular case. They are instead determinations—or "findings," if that term is used in a very broad sense—in the nature of generalizations about human experience of the kind that are brought to bear in a legislature's decision to enact a statute ("legislative facts"), in a constitutional convention's or an electorate's decision to adopt a constitution ("constitutional facts"), or the decision of a court of last resort to establish a legal rule interpreting a constitution or statute or to answer a question of law not answered by constitution or statute. Findings of this last type are chosen factual premises the court uses in reasoning to a conclusion on an issue as to what rule of law is most appropriate. Although terminology is not decisive, as a convenient reminder it may be useful to refer to determinations of this kind as determinations of "precedential facts." *See generally* Fed.R.Evid. 201, Notes of Advisory Committee on Proposed Rules (distinguishing between "adjudicative facts" (referred to here as "historical facts") and "legislative facts," and using the latter category in a broad sense that apparently includes the kinds of facts referred to here as "constitutional" and "precedential").

When a court of last resort makes a determination of "precedential fact" and chooses to use it as a premise of reasoned choice of a particular rule of law, it establishes a precedent that stands until authoritatively modified or abrogated. No fact finding on that question is to be done by inferior courts in individual cases. Rather, the precedent is to be followed until overruled or otherwise abrogated.

■ A state court's pronouncement on a "precedential fact" question is not a finding of fact to which a federal court must defer under 28 U.S.C. § 2254. Nor is either a state court or a federal court, in addressing such a question, limited to examining the testimony of witnesses who appeared at trial. Indeed, a lower court is not only permitted but required to look to precedents for guidance, and, if no guidance is available in precedents (and thus the issue is one of first impression), the court may and perhaps must (as does a court of last resort when deciding an issue of first impression) look to broader sources of knowledge and reflection on human experience rather than to the limited record of evidence received at trial. The function is not one of finding the historical facts of a particular case, to which an established legal rule is then applied, but instead the function of deciding (or, in a lower court, predicting the decision of the court of last resort) upon a rule of law for all cases to which the disputed issue is relevant.

■ Applying these principles to the issue in this case, I conclude that the determinations of the Supreme Judicial Court that the process of hypnotizing Dwyer produced no new evidence and that the case thus did not invoke hypnotically aided testimony were not determinations of fact in the sense relevant to 28 U.S.C. § 2254. They were, in part determinations of precedential facts and in part determinations on mixed questions of historical fact and law. That is, in making these determinations in Clay's case, the Supreme Judicial Court referred to legal principles governing hypnotically aided testimony laid down in Clay's case and in the companion case of *Commonwealth v. Kater*, 388 Mass. 519, 447 N.E.2d 1190 (1983), and applied them to the historical facts of Clay's case—historical fact findings as to whether Dwyer provided the police with a detailed, accurate description of Clay before hypnosis and as to what information he provided after the

hypnotic sessions. The findings about human experience with investigative hypnosis were an essential part of the basis for the court's determination that Dwyer's testimony was admissible as well as the determination that Clay was not prejudiced by the enhanced certitude of Dwyer's identification by hypnosis. Another essential part of the basis for these two determinations consisted of the findings on historical fact questions as to the circumstances of Brady's hypnosis of Dwyer. Because this combination of different kinds of findings formed a basis for them, the determinations of admissibility and lack of prejudice in this case are analogous to the determination of the legality of pretrial identification procedures discussed by the Supreme Court in *Sumner*. They are determinations of mixed questions of law and fact, not within the scope of the presumption of correctness.

Moreover, for an even more fundamental reason, the Commonwealth's contention that these determinations by the Supreme Judicial Court resolve the federal law issue before this court must be rejected. The Supreme Judicial Court was speaking to state law issues, and the issues it determined are not identical with the federal law issues.

The Supreme Judicial Court, in Clay's case and in the companion case before it, adopted and applied state law rules governing the use of hypnotically aided testimony in state criminal prosecutions. *See Kater*, 388 Mass. at 524–35, 447 N.E.2d at 1195–1201 (1983). A state is, of course, free to adopt more rigorous constraints than the federal Constitution requires. The Supreme Judicial Court's determination that hypnotically aided testimony is inadmissible in state prosecutions does not speak to the question whether use of such testimony is in violation of the federally protected rights of due process and confrontation of witnesses.

With this point as background, we may usefully examine more closely the set of rules adopted by the Supreme Judicial Court as it decided *Kater* as well as the appeals of Watson and Clay. The court

concluded [in *Kater*] that testimony is admissible from a witness as to his or her present memory of events remembered prior to hypnotism and that hypnotically aided testimony (that is, testimony that was not available prior to hypnosis) is inadmissible. We recognized that hypnotism itself and the manner in which an hypnotic session was conducted would be appropriate subjects of inquiry when testimony is proffered from a previously hypnotized witness concerning events as remembered prior to hypnosis.

In this case [Clay's], the only demonstrated effect of hypnosis was Dwyer's increased certainty of his identification of Clay's photograph. It is just such an increased level of confidence that some experts say hypnosis often produces. The process of hypnotizing Dwyer produced no new evidence against either defendant. We are, therefore, not dealing with what we have called hypnotically aided testimony. We are, however, dealing with the fact that hypnosis apparently enhanced Dwyer's confidence in his identification of Clay.

\*  \*  \*  \*  \*  \*

As to the defendant Watson, we have no difficulty in concluding that he was not prejudiced by the admission of Dwyer's testimony following hypnosis.

\*  \*  \*  \*  \*  \*

We reach the same conclusion as to Dwyer's identifications of Clay's photograph and his identification of Clay at the trial. The circumstances of Dwyer's hypnosis and its possible effect on his testimony were presented to the jury. The evidence demonstrated that hypnosis could, and likely did, enhance Dwyer's confidence. In his closing argument, the prosecutor asked the jury to disregard Dwyer's posthypnotic certainty and only to use Dwyer's prehypnotic identification as corroboration of Sweatt's identification of Clay. In these circumstances, considering the entire record, we conclude that Clay was not prejudiced by the admission of testimony concerning Dwyer's posthypnotic positive identifica-

tion of Clay's photograph or by Dwyer's in-court identification of Clay.

388 Mass. at 540–42, 447 N.E.2d at 1185–86 (footnotes omitted).

Petitioner sharply challenges the determinations that the increase in degree of Dwyer's certainty was not "hypnotically aided testimony" and was not "new" evidence. Petitioner correctly observes that the record clearly indicates that Dwyer was only about eighty percent sure of his identification of Clay before hypnosis, and was positive about his identification of Clay after undergoing hypnosis. If Dwyer's testimony had been the only evidence identifying Clay, it is plain that the likelihood of conviction would have been substantially altered by Dwyer's being more nearly certain of his identification. To say that the witness did not give "new" evidence but was only more certain about the "same" evidence may appear to exalt form over substance. It is true, of course, that form of expression may have a significant impact because of its potential influence on thought. But there is no federal constitutional constraint upon how state courts express their state law rules. The Constitution speaks to substance, not semantics. Moreover, a fair reading of the Supreme Judicial Court's opinion is that it used "new evidence" and "hypnotically aided testimony" synonymously and in contrast with "testimony … from a witness as to his or her present memory of events remembered prior to hypnotism."

"New" evidence (or "hypnotically aided" testimony), as so defined, is inadmissible under this state law rule if first proffered by the government. But the court explicitly declined to impose the more sweeping constraint of excluding all identification testimony of a witness who has been hypnotized at some time before the testimony is proffered.

Having adopted an intermediate position rather than always excluding or always receiving the testimony of such a witness, the court faced some additional questions immediately and no doubt will face others as experience under the state law rule develops. Immediately it fashioned two rules—one rule forbidding the Commonwealth, during its case in chief, at a retrial granted to Watson because of error in the charge on felony murder, from presenting evidence of Dwyer's post-hypnotic photographic identification of Watson and Clay, and another rule allowing Watson at the retrial to raise the question of effect of hypnosis on Dwyer's in-court testimony. 388 Mass. at 542 n. 5, 447 N.E.2d at 1187 n. 5. Also, though declaring that a conviction upon hypnotically aided testimony about events not remembered before hypnosis would not be allowed, the court held that it would not set aside a conviction, in circumstances involving such corroborative evidence as was introduced in this case, merely because the jury heard evidence of the hypnotically enhanced confidence of the witness in his identification of Clay. In doing so, it also determined, on the record as a whole, that Clay was not prejudiced by the jury's hearing this evidence.

This determination of lack of prejudice was not a finding of fact in the sense of historical fact. The relevant historical facts were undisputed. Also, the court appears to have assumed in Clay's favor that hypnosis did cause the enhancement of confidence of the witness in the photographic identification from eighty percent or "pretty sure" to 100 percent or "sure." The determination that this enhancement of confidence did not prejudice Clay was based on an evaluation of the entire record.

The Commonwealth argues that this determination of no prejudice must be presumed correct and is decisive against petitioner's federal law claim of violation of his rights of due process and confrontation. The contention must be rejected not only because this is a determination beyond the scope of the presumption stated in § 2254 but also because it is a determination on a state law issue that differs from any federal law issue presented by petitioner's claim of violation of his rights of due process and confrontation. The primary federal law issues at stake here are fundamentally proscriptive rather than descriptive. And, as an examination of analogies in precedent will disclose (*see* part IV, *infra*), the issue

of prejudice that may arise under federal law is very different from the issue of prejudice determined by the Supreme Judicial Court.

The Commonwealth argues also that petitioner is asserting no more than an evidentiary error in claiming that the trial court improperly admitted Dwyer's testimony since "[h]abeas relief is unavailable to persons solely on the basis of alleged errors in evidentiary rulings." *Salemme v. Ristaino*, 587 F.2d 81, 85 (1st Cir.1978), *citing Lisenba v. California*, 314 U.S. 219, 228, 62 S.Ct. 280, 286, 86 L.Ed. 166 (1941). The Commonwealth thus argues that petitioner's claim does not meet the constitutional threshold required for habeas relief. This argument must be rejected. Clay is seeking relief based on alleged constitutional violations in admitting Dwyer's testimony. Precedents regarding evidentiary errors with no constitutional implications are inapposite.

## IV. *Confrontation Clause Claim*

Petitioner argues that the admission of Dwyer's testimony violated his Sixth Amendment right to the confrontation of witnesses, applicable to state criminal proceedings through the Fourteenth Amendment. *Pointer v. Texas*, 380 U.S. 400, 85 S.Ct. 1065, 13 L.Ed.2d 923 (1965). The Supreme Court has emphasized that the confrontation clause reflects a preference for the confrontation of witnesses at the time of trial, *Ohio v. Roberts*, 448 U.S. 56, 63, 100 S.Ct. 2531, 2537, 65 L.Ed.2d 597 (1980), and a primary interest secured by the clause is that of cross-examination. *Douglas v. Alabama*, 380 U.S. 415, 418, 85 S.Ct. 1074, 1076, 13 L.Ed.2d 934 (1965). The Court has also stated that confrontation "permits the jury that is to decide the defendant's fate to observe the demeanor of the witness in making his statement, thus aiding the jury in assessing his credibility." *California v. Green*, 399 U.S. 149, 158, 90 S.Ct. 1930, 1935, 26 L.Ed.2d 489 (1970). Clay's argument is in essence that the potential for effective cross-examination of a witness is destroyed by the process of hypnosis, since hypnosis will cause a witness to develop an unshakeable confi-

dence in the accuracy of his post-hypnotic perception. Clay claims that Dwyer reacted to his hypnotic experience in exactly this manner. First, any doubts he may have had as to the accuracy of his identification of Clay evaporated immediately following his first hypnosis. Second, despite the increased certainty of his post-hypnotic recollection, Dwyer attributed his positive identification to his original observation. Finally, Clay claims, Dwyer's increased confidence in the accuracy of his perception altered his demeanor as a witness. Therefore, it is argued, Clay's counsel was unable to cross-examine Dwyer as to his pre-hypnotic doubts regarding his identification of Clay.

The force of this argument depends upon the evaluation of disputed expert opinion, some of which was offered at trial in the presence of the jury and far more of which is available in published materials that were called to the attention of the Supreme Judicial Court, the trial court, and this court, in briefs and arguments. Numerous courts have noted the likelihood that hypnotic subjects will show increased confidence in the truth of their recollection under hypnosis, regardless of whether such recollections are accurate. *See, e.g., Commonwealth v. Kater*, 388 Mass. 519, 528, 447 N.E.2d 1190, 1197 (1983); *People v. Shirley*, 31 Cal.3d 18, 65, 181 Cal.Rptr. 243, 272, 641 P.2d 775, 803, *cert. denied*, 459 U.S. 860, 103 S.Ct. 133, 74 L.Ed.2d 114 (1982); *Commonwealth v. Nazarovitch*, 496 Pa. 97, 105, 436 A.2d 170, 174 (1981); *State v. Mena*, 128 Ariz. 226, 230, 624 P.2d 1274, 1278 (1981); *State v. Mack*, 292 N.W.2d 764, 769 (Minn.1980).

The likelihood of increased confidence of a witness after hypnosis is said to have at least two significant consequences. First, this increased confidence makes it difficult, if not impossible, for a jury to judge the credibility of the witness and his memory. *State v. Hurd*, 86 N.J. 525, 540, 432 A.2d 86, 93–94 (1981); *People v. Gonzales*, 108 Mich.App. 145, 160, 310 N.W.2d 306, 313–14 (1981), *aff'd*, 415 Mich. 615, 329 N.W.2d 743 (1982). Second, the witness's honestly held belief in the veracity of his post-hypnotic

recollections makes efforts to question any pre-hypnotic doubts or discrepancies impossible. "The basic problem is that [a witness who] sincerely believes that what he or she is relating is the truth ... become[s] resistant to cross examination and immune to effective impeachment to ascertain the truth." *State ex rel. Collins v. Superior Court*, 132 Ariz. 180, 188, 644 P.2d 1266, 1274 (1982). The Fifth Circuit has thus stated that after hypnosis a witness

> may have an unshakeable subjective conviction that gives his account on the witness stand the imprimatur of absolute confidence. Indeed, in a criminal trial, the witness's resultant undue confidence might violate the defendant's constitutional right to confront and cross-examine adverse witnesses, for an absolute conviction in the accuracy of his memory might make it "impossible to cross-examine [the] witness in any meaningful way."

*United States v. Valdez*, 722 F.2d 1196, 1202 (5th Cir.1984), *quoting State v. Mack*, 292 N.W.2d at 769. These precedents support an assumption—as a matter of precedent and not merely as a matter of fact finding in this particular case—that the hypnosis of Dwyer increased his confidence in his identification of Clay and made it impossible to question Dwyer as effectively as would otherwise have been possible about the basis, nature and scope of the uncertainty he had before undergoing hypnosis.

This conclusion does not necessarily mean, however, that the admission of Dwyer's testimony violated Clay's Sixth Amendment right to confrontation. The confrontation clause provides that "[i]n all criminal prosecutions, the accused shall enjoy the right ... to be confronted with the witnesses against him." The Supreme Court has noted, however, that "[i]f one were to read this language literally, it would require, on objection, the exclusion of any statement made by a declarant not present at trial." *Ohio v. Roberts*, 448 U.S. at 63, 100 S.Ct. at 2537. Such a sweeping application of the confrontation clause would lead to the abrogation of virtually every hearsay exception, a result

courts have rejected as unintended and too extreme. *Id.*

Therefore I must analyze the circumstances of the admission of Dwyer's testimony to determine whether Clay's right to confrontation was violated. Dwyer was available at trial. He testified and was cross-examined. That he was subject to less effective cross-examination is not the equivalent of denial of the right to cross-examine. Impairment of the right to cross-examine is not a denial of that right unless the impairment is in such a degree as to be the functional equivalent of denial. Does hypnosis impair in this degree the right to cross-examine, thereby violating the Sixth Amendment right to confrontation, applicable through the Fourteenth Amendment to state criminal prosecutions?

Published generalizations about experience with hypnosis and evaluations of these generalizations in reported judicial opinions reveal perhaps a consensus, and at the least a strongly prevailing view, on each of the following matters:

(1) A person under hypnosis is extremely susceptible to the suggestions he perceives are emanating from the hypnotist, whether or not such suggestions are intended. *See, e.g., People v. Hughes*, 59 N.Y.2d 523, 534–35, 466 N.Y.S.2d 255, 260, 453 N.E.2d 484, 489 (1983); *State v. Mack*, 292 N.W.2d at 768; Diamond, *Inherent Problems in the Use of Pretrial Hypnosis on a Prospective Witness*, 68 Cal.L.Rev. 313, 333 (1980).

(2) A person under hypnosis develops a distorting desire to please the hypnotist. *See, e.g., United States v. Valdez*, 722 F.2d at 1201; *Commonwealth v. Nazarovitch*, 496 Pa. at 104, 436 A.2d at 174.

(3) A hypnotic subject is likely to confabulate—to invent details to fill in the gaps in his memory in order to make his account of events previously observed more logical, complete, and acceptable to the hypnotist. *See, e.g., United States v. Valdez*, 722 F.2d at 1200, *citing* Orne, *The Use and Misuse of Hypnosis in Court*, 27 Int'l J. Clinical and Experimental Hypnosis 311, 317 (1979); Diamond, *supra*, at 335.

(4) Hypnotic subjects are likely to mix their pre-hypnotic memories with what they have recalled under hypnosis, so neither they nor the hypnotist nor any other person will be able to distinguish between memories of observed events existing before hypnosis and memories of impressions generated during hypnosis. *See, e.g., Commonwealth v. Kater*, 388 Mass. at 528, 447 N.E.2d at 1196; Diamond, *supra*, at 337; Orne, *supra*, at 328–32.

(5) A person placed under hypnosis is likely to develop an increased subjective confidence in his post-hypnotic memory.

(6) A competent hypnotist, using procedural safeguards, can reduce the risk that after hypnosis a witness will be unable to distinguish between impressions developed during hypnosis and memories of pre-hypnotic observation, *see, e.g., State v. Hurd*, 86 N.J. at 545–46, 432 A.2d at 96–97 (adopting the recommendations of Dr. Martin Orne, plaintiff's expert in this case, as prerequisites to the admission of testimony of a previously hypnotized witness); *Commonwealth v. A Juvenile*, 381 Mass. 727, 732 n. 8, 412 N.E.2d 339, 343 n. 8 (1980).

(7) Procedures for preserving a record of the subject's pre-hypnotic memory and of the method used in preparing for and conducting the hypnotic session are essential to determining the reliability of the testimony of a previously hypnotized witness as to events recalled before hypnosis.

Beyond these areas of quite general agreement, sharp differences exist among persons who have studied and commented upon investigative use of hypnosis. The areas of dispute, along with differences about what legal constraints are appropriate in view of generalizations as to which there is agreement, account for widely varied responses of state courts of last resort regarding the extent to which hypnotically aided testimony may be received in evidence in criminal prosecutions.

Some courts admit testimony of a witness who has been hypnotized, viewing the process of hypnosis as merely affecting credibility. *See, e.g., State v. Wren*, 425 So.2d 756 (La.1983); *Chapman v. State*, 638 P.2d 1280 (Wyo.1982). They conclude

that traditional legal devices such as cross-examination, expert testimony on the risks of hypnosis, and cautionary instructions allow a jury to evaluate the credibility of previously hypnotized witnesses.

Many more courts have concluded that the process of hypnotizing a witness affects the admissibility of that witness's testimony, and not merely its credibility. These courts are more skeptical of the ability of a jury to evaluate the credibility of testimony by a witness who has been hypnotized, in part because of the qualities of hypnosis noted above. They have therefore held that testimony from a hypnotized witness concerning matters not remembered before hypnosis is inadmissible. *See, e.g., State ex rel. Collins v. Superior Court*, 132 Ariz. 180, 644 P.2d 1266 (1982); *State v. Mack*, 292 N.W.2d 764 (Minn.1980); *Commonwealth v. Nazarovitch*, 496 Pa. 97, 436 A.2d 170 (1981); *Commonwealth v. Kater*, 388 Mass. 519, 447 N.E.2d 1190 (1983). Some of these courts have approved the admission of testimony by a previously hypnotized witness as to events remembered before hypnosis. *See, e.g., Kater*, 388 Mass. at 529 n. 7, 447 N.E.2d at 1197 n. 7 (listing cases). Other courts have admitted testimony enhanced by hypnosis, but only if proper procedural safeguards are followed when conducting the hypnotic session. *See, e.g., State v. Hurd*, 86 N.J. 525, 432 A.2d 86 (1981). The California Supreme Court has gone even further, declaring that testimony of a witness who has been hypnotized is inadmissible as to all events that were the subject of a hypnotic experience, from the time of the hypnotic session forward. *People v. Shirley*, 31 Cal.3d at 66–67, 181 Cal.Rptr. at 273, 641 P.2d at 804.

■ In these circumstances, I conclude that the Sixth Amendment right to confrontation of witnesses, as applicable to state criminal proceedings through the Fourteenth, does impose federal constitutional constraints on the admissibility of testimony by a previously hypnotized witness, but does not entirely preclude the use at trial of such testimony. Very likely, federal

constitutional constraints will preclude the use of testimony from a hypnotized witness concerning matters not remembered before hypnosis. These constraints are less likely, however, to preclude testimony as to matters disclosed by the witness before undergoing hypnosis, especially if the government can show by convincing evidence that the procedures used in preparing for and conducting the hypnotic sessions include reasonable safeguards against suggestibility. In deciding the present case, I need not and do not determine the precise limits that federal constitutional constraints place on the admissibility of testimony of a previously hypnotized witness. Rather, I need only determine whether in the circumstances of this case petitioner's right to cross-examine the witness Dwyer was so impaired by hypnosis that petitioner's right to confrontation was thereby violated.

In the present case, petitioner moved in the trial court to suppress all evidence of identification of petitioner by Dwyer, both at trial and in pre-trial identification of photographs. The record does not disclose a motion or request of the petitioner, even in the alternative, to exclude only the evidence of post-hypnosis increase of confidence in Dwyer's identification of petitioner. Thus, insofar as petitioner argues in the alternative here for application of any rule less stringent than total exclusion, he presents an argument never presented at trial. This, of course, is not a barrier to consideration of the claim that the right to confrontation supports a per se rule of exclusion of all testimony of identification by a witness who has been hypnotized at some time before trial. It is, however, at least a relevant factor in the resolution of any alternative claim that some less stringent rule should have been applied—no such rule having been formulated in any request for ruling by the trial court. In view, however, of the importance of the right at stake and the lack of guiding precedent on the confrontation claim, I do not treat it as a bar to consideration of the question whether the right of confrontation was violated here, even though I have concluded that the Sixth Amendment does not support a per se rule rejecting all testimony of a witness who has been subjected to hypnosis at some time before trial.

In this case the trial court found that the hypnotized witness Dwyer made an eighty percent or "pretty sure" identification of a photograph of petitioner before undergoing hypnosis. Also, the trial court found that the photographs shown to Dwyer constituted a fair array and that there was no evidence that any police officer attempted to influence Dwyer's selections as he looked at the photographs (App. 18). These findings are supported by the record and are here presumed to be correct. The effect of hypnosis in this case was to increase Dwyer's degree of confidence from "eighty percent" or "pretty sure" before hypnosis to "100 percent sure" after hypnosis. Therefore, though petitioner moved both in the trial court and before the Supreme Judicial Court to suppress Dwyer's entire testimony, the only harm of which he may complain is, first, harm incident to the jury's hearing testimony regarding Dwyer's twenty percent increase in confidence about his pre-trial identification, second, the influence of that increased confidence upon Dwyer's in-court identification at trial, and, third, the obstacle of pre-trial hypnosis to effective cross-examination. I conclude that this harm does not rise to the level necessary to support a determination that the admission of Dwyer's testimony so impaired Clay's right to cross-examination that federal constitutional constraints would bar such testimony as a violation of Clay's right to confrontation.

First, Dwyer was available at trial and was subject to cross-examination. The jury also heard extensive testimony regarding the circumstances of Dwyer's hypnosis and its possible effect on his testimony.

Second, there is no consensus among those who have studied and commented upon the use of hypnosis that all testimony of a previously hypnotized witness is unreliable, even when the observations stated in the testimony were disclosed by the witness before undergoing hypnosis and regardless of the safeguards used during

hypnosis. In fact, as noted earlier, most state courts of last resort, with the exception of California, in some circumstances permit the admission of testimony of a previously hypnotized witness as to matters disclosed before undergoing hypnosis. State precedents are not decisive of the federal issue, but many of the state decisions were made in the face of federal constitutional claims. They represent a cogent body of judicial opinion.

Third, the decisive issue is whether the hypnosis of Dwyer so thoroughly impeded cross-examination as to amount to a denial of the right to confrontation. This is an issue that has not yet reached either the Supreme Court or any Court of Appeals for decision. A search for instructive analogies turns naturally to decisions regarding admission of hearsay statements of a declarant unavailable for cross-examination at trial. In that context, the Supreme Court has allowed the government's use of such statements if they bear sufficient indicia of reliability. *Cf. Ohio v. Roberts*, 448 U.S. at 65–66, 100 S.Ct. at 2538–2539. I conclude that Dwyer's identification testimony in this case, taken together with other evidence in the case, bears sufficient indicia of reliability to support a determination that petitioner's right to confrontation was not violated. This is not a case involving testimony from a hypnotized witness as to matters not remembered before hypnosis. Rather, the primary effect of hypnosis in this case was to increase Dwyer's confidence in his identification of petitioner by twenty percent. Given Dwyer's availability at trial, the limited nature of the changes in Dwyer's statements after hypnosis, and other indicia of reliability of the identification discussed in part V, *infra*, I cannot say that admission of this testimony so impaired Clay's right to cross-examination that the right to cross-examination was effectively denied.

For these reasons I conclude that Clay's right to confrontation was not violated. In so concluding I do not address the issue that would be presented by evidence of deliberately using hypnosis suggestively to obtain hypnotically aided testimony of an identification that had not been made before hypnosis. The findings of the trial court on historical facts of this case, presumed to be correct, preclude such a contention here. The trial court found (App. 48) that the Commonwealth had met its burden of showing the need to hypnotize Dwyer, given the seriousness of the offense involved and Dwyer's inability before hypnosis to identify the third young man he saw. When the police decided to use hypnosis, little guidance was available in precedents. I cannot conclude that it was unreasonable for them to believe that the use of investigative hypnosis in the way they used it was permitted by state and federal law. In these circumstances, I conclude that the trial judge's finding that prosecutorial authorities acted in good faith is supported by the record.

■ I turn, next, to the argument that the Supreme Judicial Court erred as a matter of law in determining that Clay was not prejudiced by the jury's hearing testimony of Dwyer's post-hypnotic increased confidence in his pre-hypnotic photographic identification of Clay. Had I concluded, independently of the consideration of prejudice in the particular case, that the right to confrontation is violated by investigative use of hypnosis, it would be necessary to consider the standard of prejudice that is relevant to any contention that even if a constitutional error was committed, it was harmless. *See United States v. Hasting*, 461 U.S. 499, 508–09, 103 S.Ct. 1974, 1980, 76 L.Ed.2d 96 (1983). Here, however, I address the question of harm or potential harm only insofar as the state's harmless error rule is one rule among those in the set of rules the Supreme Judicial Court has adopted in relation to hypnotically influenced testimony. The Supreme Judicial Court's rule of inadmissibility of what in its terms is "new" evidence or "hypnotically aided testimony"—testimony about events not remembered before hypnosis—is, I conclude, at least as protective of defendant's rights as the due process and confrontation clauses will be held to require. A state may permissibly combine with a more rigorous rule of inadmissibility than is constitutionally required a less rigorous rule of

harmless error, if the combination of these rules does not permit evidence to be received in violation of constitutional constraints. Thus, the relevant question of federal law is whether the combined set of rules applied by the Supreme Judicial Court in this case allowed a conviction in circumstances forbidden by federal constitutional law.

Relying for guidance upon the generalizations and conclusions regarding hypnosis discussed above, I conclude that the set of rules the Supreme Judicial Court has adopted in relation to the use of hypnotically influenced testimony in criminal prosecutions, as applied to the present case, was not in violation of petitioner's federally protected right to confrontation. The risks of use of hypnotically influenced testimony and the problems associated with hypnotically aided investigation are subjects of intense controversy. As noted above, different states have adopted very different rules applicable to criminal prosecutions in their respective jurisdictions, and no doubt will continue to do so. The set of rules adopted by the Supreme Judicial Court of Massachusetts is more restrictive than some and less restrictive than others. I conclude that they are within permissible federal constitutional limits.

## V. *Due Process Claim*

Petitioner argues that the admission of Dwyer's identification testimony deprived him of his Fourteenth Amendment right to due process of law (apart from, and in addition to, the right to confrontation incorporated into due process). He claims that Dwyer's in-court identification was unreliable and was produced by an impermissibly suggestive hypnotic procedure. I conclude, as did the trial judge, that admission of Dwyer's testimony· did not violate this Fourteenth Amendment due process right. Even if the procedures used in hypnotizing Dwyer were impermissibly suggestive (an assumption made arguendo), Dwyer's identification satisfies the reliability test set out by the Supreme Court in *Neil v. Biggers*, 409 U.S. 188, 199–200, 93 S.Ct. 375, 382, 34 L.Ed.2d 401 (1972), and *Manson v.*

*Brathwaite*, 432 U.S. 98, 114, 97 S.Ct. 2243, 2253, 53 L.Ed.2d 140 (1977).

Eyewitness identification evidence must be suppressed if suggestive pretrial identification procedures have led to "a very substantial likelihood of irreparable misidentification." *Simmons v. United States*, 390 U.S. 377, 384, 88 S.Ct. 967, 971, 19 L.Ed.2d 1247 (1968). A two-step inquiry is required to determine whether such evidence must be suppressed. First, it must be determined if the pretrial identification procedures were unduly suggestive of the suspect's guilt. If so, the suggestiveness of the procedures must be weighed against "factors indicating that the in-court identification was independently reliable." *Dickerson v. Fogg*, 692 F.2d 238, 244 (2d Cir.1982). In-court identifications, if reliable, will not be suppressed even if suggestive identification procedures have been used.

The Supreme Court has listed five factors to consider in evaluating the reliability of eyewitness identification. These include:

> the opportunity of the witness to view the criminal at the time of the crime, the witness' degree of attention, the accuracy of his prior description of the criminal, the level of certainty demonstrated at the confrontation, and the time between the crime and the confrontation.

*Manson v. Brathwaite*, 432 U.S. at 114, 97 S.Ct. at 2253; *Neil v. Biggers*, 409 U.S. at 199–200, 93 S.Ct. at 382. An analysis of these five factors indicates that Dwyer's identification satisfies the reliability test:

1. *The opportunity to view.* The trial court found that the artificial lighting on Washington Street was very good and Dwyer had ample opportunity to view the incident he described (App. 65). These findings are supported by the record. Petitioner correctly notes that the relevant determination is the witness's opportunity to view the criminal. The trial court found, however, that Dwyer was able to view the youths he described from a distance of five to seven feet for approximately thirty seconds (App. 65). This factual finding is

supported by the record. Dwyer thus had the opportunity to view Clay.

2. *Degree of attention.* The trial court found that Dwyer's degree of attention was high. Dwyer testified that he likes to scrutinize potential customers for bulges in their clothing and look people in the eyes to size them up (Tr. 4:144, 145). Dwyer so scrutinized the three young men he saw on Washington Street and their suspicious appearances made such an impression on him that he declined to accept them as fares (Tr. 4:146). Petitioner argues that Dwyer himself testified that his observation "was a casual thing at the time" and that he "did not attach any significance to it then." (Tr. 7:16–17). Dwyer also testified, however, that he got a good look at Clay (Tr. 7:40). I conclude that the trial court's findings that Dwyer had a high degree of attention is supported by the record.

3. *The accuracy of the description.* Dwyer admittedly did not provide a detailed description of Clay before undergoing hypnosis. He was only able to say that the three persons he saw were young, black males, that two of the men were over six feet in height, that one (later identified as Clay) was considerably shorter, and that two of the men wore dark jackets and the third wore a light jacket. Nevertheless, such a vague description does not cast great doubt on the reliability of Dwyer's identification of Clay, for Dwyer was able to make an "eighty-percent-sure" identification of a photograph of Clay only twelve hours after he saw the three young men enter the taxicab. The trial court found that the twelve photographs Detective Berlo showed Dwyer constituted a fair photographic array and that there was no evidence that Berlo or any other police officer attempted to influence Dwyer while he was looking at the photographs (App. 18). These findings are supported by the record. Thus, while Dwyer was unable to give a detailed description of Clay, he was able to make a reasonably certain identification of him during a non-suggestive procedure.

4. *Level of certainty.* The trial court found that Dwyer's pre-hypnotic photo identification was "relatively strong." This finding is supported by the record as a whole. Although Dwyer was not 100 percent certain of his identification of Clay, he testified that he "was almost fully convinced that it was him at the time." (Tr. 4:153). The trial court's finding that Dwyer's identification of Clay was relatively strong is supported by the record.

5. *Time between crime and confrontation.* Contrary to petitioner's argument, this factor supports the conclusion that Dwyer's testimony was reliable, for Dwyer was able to make a relatively strong identification of Clay, and this identification took place during a non-suggestive procedure only twelve hours after Dwyer had viewed the suspects.

All findings on these five factors are well supported by the record. In this proceeding, they are presumed to be correct. 28 U.S.C. § 2254.

■ The analysis of these five factors leads to the conclusion that Dwyer's identification testimony was independently reliable. His pre-hypnosis identification of photographs was reliable, its independent reliability was not destroyed by hypnosis, and in the circumstances of this case, in which I have also concluded that Clay's right to confrontation was not violated, I conclude that the pre-hypnosis identification of photographs of Clay and Watson provided an independent basis for the reliability of the identification testimony received at trial. Therefore, admission of Dwyer's testimony did not violate Clay's due process rights under the Fourteenth Amendment. This is not a case in which I can say that, considering the totality of the circumstances, there is "a very substantial likelihood of irreparable misidentification." *Simmons,* 390 U.S. at 394, 88 S.Ct. at 976. "Juries are not so susceptible that they cannot measure intelligently the weight of identification testimony that has some questionable feature." *Manson v. Brathwaite,* 432 U.S. at 116, 97 S.Ct. at 2253.

The petition for habeas corpus will therefore be denied.