781 P.2d 642

**The STATE of Arizona, Petitioner,**

v.

**The Honorable William SHERRILL, Judge of the Superior Court, In and For the County of Pima, Respondent.**

**and**

**Thomas Raymond VOGT, Real Party in Interest.**

**No. 2 CA–SA 89–0047.**

Court of Appeals of Arizona,
Division 2, Department B.

May 16, 1989.

Review Granted Nov. 14, 1989.

Stephen D. Neely, Pima County Atty. by Louis M. Spivack, Tucson, for petitioner.

Harold L. Higgins, Jr., Pima County Public Defender by Creighton Cornell, Tucson, for real party in interest.

OPINION

LACAGNINA, Chief Judge.

The state has taken this special action from the trial court's order granting Thomas Raymond Vogt's motion to preclude the victim of certain crimes from making an in-court identification of Vogt as the perpetrator of those crimes. Because of the unique circumstances of this case and because the state has no equally plain, speedy, and adequate remedy by appeal, we accept jurisdiction. Ariz.R.P. Spec. Action 1, 17B A.R.S.

On April 8, 1987, Robert Johnson was shot in the head during an armed robbery of his jewelry store. In the Tucson Medical Center emergency room, although drifting

in and out of consciousness, Johnson was able to provide the police with a description of the person he believed had robbed and shot him. He described that person as a slender white male, 35 to 40 years of age, approximately 5'11" tall, with medium length grey or black hair and wearing a short-sleeved sports shirt. Later during that month Johnson met with Detective David Tribble of the Tucson Police Department on a number of occasions to discuss the crimes and the description of the person who had committed them. During these discussions, Johnson's description varied with respect to the person's height, weight and age. The height varied from 5'6" to 5'11" and the weight was as low as 160 pounds and as high as 200. The person's age was between 30 and 40 years. Johnson maintained, however, that he had a clear picture of the assailant in his mind. His hair was always dark brown or black, and Johnson consistently described him as "clean-cut." According to the state, he was able to describe the briefcase and the pistol the individual carried and certain things about his mannerisms, recalling that the person had been in his store on two other occasions. At least three of these conversations with Detective Tribble were recorded.

On June 9, 1987, Johnson was hypnotized by Detective Seng of the Tucson Police Department. At that time, the police had no suspects. During hypnosis, Johnson described the individual who had robbed him as a slender, 30–year–old white male, 180 to 185 pounds, 5'9" to 5'10" tall, with brown hair and wearing a sports jacket. Immediately after he was hypnotized, Johnson worked with a forensic artist in the preparation of a composite sketch of the person he was able to describe.

Sometime during August of 1987 Vogt became a suspect after he was arrested in another state and information obtained through independent sources implicated him in the robbery and assault of Johnson. On August 27, 1987, Johnson was shown a photographic lineup that included a black and white mug shot of Vogt taken several years before. Johnson was unable to identify him.

On November 10, 1987, Vogt was indicted by the Pima County Grand Jury on one count each of armed robbery, burglary in the first degree and kidnapping and two counts of aggravated assault. The jury trial commenced in March of 1989. On March 2, 1989, nearly 21 months after he was hypnotized, Johnson began his testimony before the jury and, much to the surprise of counsel for the defense and the state, identified Vogt as the man who had robbed him. Before beginning his cross-examination of Johnson, Vogt's counsel moved for a mistrial on the grounds that Johnson's in-court identification of Vogt was tainted by the June 9, 1987, hypnosis and was, therefore, inadmissible. On March 6, 1989, a hearing was held outside the presence of the jury on the issue of whether a mistrial should be granted. Detectives Seng and Tribble and the forensic artist testified. According to both detectives, no additional information was obtained from Johnson as a result of hypnosis. Consequently, the hypnosis was considered a failure. Detective Seng testified that in his opinion, the hypnosis did not have any effect upon the in-court identification of Vogt. According to Detective Tribble, the information provided by Johnson did not in any way assist the police in the apprehension of Vogt as a suspect.

On March 7, 1989, the trial court declared a mistrial and the state sought special action relief in this court. A majority of this court declined to accept jurisdiction, noting that counsel for the defense and state had been sufficiently surprised by the in-court identification of Vogt that the trial court's decision to require a new trial was not arbitrary and capricious. This court unanimously found, however, that the court's ruling on the admissiblity of the in-court identification was erroneous because it was not tainted by the hypnosis which occurred 21 months before the identification.

The case was set for a new trial. Counsel for the defense filed a motion to preclude "all testimony by Robert Johnson concerning any memory or events occurring after June 8, 1989 (post-hypnosis)."

Relying upon the Arizona Supreme Court's decision in *State ex rel. Collins v. Superior Court*, 132 Ariz. 180, 644 P.2d 1266 (1982), the trial court granted the motion insofar as it sought to preclude Johnson from identifying Vogt as the perpetrator of the crime and the state from offering the composite drawing into evidence. The state then filed this special action, seeking relief from that portion of the trial court's order precluding the in-court identification of Vogt.

The trial court's decision was based upon an erroneous interpretation and application of *Collins*.[1] *Collins* may be separated into two decisions: the supreme court's initial opinion (*Collins* I), and the supplemental opinion upon rehearing (*Collins* II). The facts in *Collins* are straightforward. Between 1977 and 1980, 18 rapes were reported in a certain part of West Phoenix, all of which followed a similar pattern. The perpetrator of these crimes carried a "rape kit" which contained ropes, blindfolds, a ground cloth and toilet paper. Wearing a mask and armed with a pistol, he approached couples in vehicles and told them he was going to steal their car or take their money. He would then use the items in his "rape kit" for various purposes during the course of the ensuing rape. On July 1, 1980, after he approached an unmarked police car, the defendant was arrested wearing a mask and carrying a pistol and a "rape kit."

Before the defendant's trial, six of the rape victims and one attempted rape victim were hypnotized. The trial court granted the defendant's motion in limine, precluding the hypnotized victims from testifying at trial in light of the supreme court's decision in *State v. Mena*, 128 Ariz. 226,

624 P.2d 1274 (1981). In *Mena*, the court held that "until hypnosis gains general acceptance in the fields of medicine and psychiatry as a method by which memories are accurately improved without undue danger of distortion, delusion or fantasy, we feel that testimony of witnesses which has been tainted by hypnosis should be excluded in criminal cases." 128 Ariz. at 231, 624 P.2d at 1279. After an exhaustive discussion of hypnosis and the inherent problems of post-hypnotic testimony, the supreme court in *Collins* I denied the state's petition for special action relief, holding that when a witness's memory of any part of an event has been "tainted" by the hypnotic process, that witness is rendered incompetent to testify for any purpose and with respect to any fact, including those facts he or she was able to recall prior to the hypnosis.

The state moved for rehearing, which was granted. In *Collins* II, after yet another lengthy discussion of the intricacies of the hypnosis process and the numerous issues relating to post-hypnotic testimony, the court reaffirmed its prior decision insofar as it held that the test set forth in *Frye v. United States*, 293 F. 1013 (D.C.Cir. 1923), for determining the admission of evidence obtained from the use of a scientific principle, theory or discovery is applicable to hypnotically-induced recall testimony.[2] 132 Ariz. at 199, 644 P.2d at 1285. The court noted that by applying the *Frye* test, the admissibility of hypnotically-induced recall testimony is determined not on a case-by-case basis but by answering the threshold question of whether such testimony is, in general, reliable. Applying the *Frye* test, the court reaffirmed its prior position that "the threshold question of reliability must be resolved by precluding courtroom use of hypnotically recalled testimony" be-

---

1. We do not address any issues relating to Johnson's competency, other than in the context of *Collins*, or the permissibility of the identification as discussed in *State v. Dessureault*, 104 Ariz. 380, 453 P.2d 951 (1969), because neither the state nor Vogt have raised these issues. Our decision is limited to the interpretation and application of *Collins*.

2. The court in *Frye* noted:
Just when a scientific principle or discovery crosses the line between the experimental and demonstrable stages is difficult to define. Somewhere in this twilight zone the evidential force of the principle must be recognized, and while courts will go a long way in admitting expert testimony deduced from a well-recognized scientific principle or discovery, the thing from which the deduction is made must be sufficiently established to have gained general acceptance in the particular field in which it belongs.
293 F. at 1014.

cause "hypnosis has not received sufficient general acceptance in the scientific community to give reasonable assurance that the benefit of the results produced under even the best of circumstances will be sufficiently reliable to outweigh the risks of abuse or prejudice." 132 Ariz. at 201, 644 P.2d at 1287.

The court in *Collins* II did, however, modify its prior decision that, once hypnotized, the witness is, per se, incompetent to testify as to any matters, including those matters recalled prior to hypnosis. Applying the *Frye* test and accepting the state's argument that hypnosis is generally accepted in the scientific community as a valuable investigative tool which the per se rule would render useless, the court held:

> Thus ... we modify our previous decision and hold that a witness will not be rendered incompetent merely because he or she was hypnotized during the investigatory phase of the case. That witness will be permitted to testify with regard to those matters which he or she was able to recall *and* relate prior to hypnosis.

132 Ariz. at 209, 644 P.2d at 1285 (emphasis in original).

The court discussed how matters "demonstrably recalled prior to hypnosis" may be distinguished from those which were recalled after hypnosis and which remain inadmissible per se. First, the witness may be cross-examined and expert testimony presented. Second, the party who is attempting to introduce pre-hypnosis recall must be required to record, either in writing, by tape recorder or videotape, those matters that the witness was able to recall before hypnosis. In addition, the hypnosis session should be recorded. In granting the state's requested relief and remanding the case to the trial court, the *Collins* II court concluded:

> To those who may feel that we are overly apprehensive and cautious on the subject of hypnosis, we can only state that the law has long recognized that there are few dangers so great in the search for truth as man's propensity to tamper with the memory of others. The prevention of such an evil is necessary for the benefit of all....

132 Ariz. at 210, 644 P.2d at 1286.

■ Before analyzing the trial court's interpretation and application of *Collins*, we note that none of the evils feared by the court in *Collins* I or *Collins* II are present in this case. Based upon our review of the record, there is no evidence that any attempts were made to tamper with Johnson's memory by suggestion or that Johnson is guilty of confabulation or lying. In fact, it was impossible for the authorities to have influenced his memory in any manner so as to implicate Vogt as the perpetrator of the crimes because Johnson was hypnotized in June of 1987 and Vogt did not become a suspect until August of that year. Moreover, not only did the hypnosis fail to reveal information that had not already been obtained from Johnson, none of the information obtained from Johnson at any time assisted the authorities in apprehending Vogt.

Without making an express determination as to what Johnson was able to recall prior to hypnosis, the trial court prohibited Johnson from identifying Vogt but denied Vogt's motion insofar as it sought to preclude Johnson from testifying as to such matters as he "could demonstrably testify to prior to the hypnosis." To reach such a result, the trial court must have drawn one of the following erroneous conclusions: (1) because Johnson was hypnotized he is, per se, precluded from identifying Vogt; or, (2) Johnson's ability to identify Vogt was the result of hypnotically-induced recall and is, therefore, precluded by *Collins* II. If the basis for the court's decision was the mere fact that Johnson had been hypnotized, that ruling is clearly contrary to the holding of *Collins* II which retracted that portion of *Collins* I which held that once a witness is hypnotized he or she is incompetent to testify as to all matters. In essence, the trial court has determined that, at least with regard to the in-court identification of Vogt, Johnson is incompetent simply because he was hypnotized. The application of a per se rule is clearly incorrect.

In addition, if Johnson was precluded from making the in-court identification because the trial court concluded that the hypnosis resulted in the identification, the trial court's ruling is equally erroneous; such a conclusion is simply unsupported by the record.[3] Ample evidence was presented at the hearing on the motion for a mistrial regarding Johnson's ability to describe the perpetrator of the crimes before he was hypnotized which was not enhanced by the hypnosis. With regard to Johnson's ability to identify Vogt in person, there is no basis for comparison because Johnson was never given the opportunity to do so until the trial. The only pretrial identification process was the photographic lineup that took place less than three months after Johnson was hypnotized. The fact that Johnson was unable to identify Vogt from the photograph strongly supports the conclusion that the hypnosis had no effect upon his ability to recall what his assailant looked like. Thus, there is no factual support for the conclusion that Johnson's in-court identification was the result of hypnotically-induced recall.

Vogt's motion to preclude is, in essence, a motion to suppress. We will not disturb the trial court's ruling on a motion to suppress absent a clear abuse of discretion. *State v. Fisher*, 141 Ariz. 227, 686 P.2d 750 (1984); *State v. Superior Court*, 128 Ariz. 583, 627 P.2d 1081 (1981), *cert. denied*, *Gretzler v. Arizona*, 461 U.S. 971, 103 S.Ct. 2444, 77 L.Ed.2d 1327 (1983). If the record contains sufficient facts to support the trial court's ruling, we will sustain it. Based upon our review of the record and the applicable law, we find that the trial court has abused its discretion. We therefore grant the state's request for relief and vacate that portion of the trial court's order precluding Johnson from identifying Vogt, remanding this case for trial and any other proceedings consistent with this opinion.

ROLL, P.J., and FERNANDEZ, J., concur.

---

**3.** We note that the safeguards set forth in *Collins* II for distinguishing pre-hypnotic from post-hypnotic recall were implemented here. Specifically, a hearing was held during which expert testimony was presented and counsel was given the opportunity to cross-examine, conversations with authorities prior to hypnosis were recorded, and the hypnosis session was recorded.