799 P.2d 849

The STATE of Arizona ex rel. Stephen D. NEELY, Pima County Attorney, Petitioner,

v.

The Honorable William SHERRILL, Judge of the Superior Court, in and for the County of Pima, Respondent,

and

Thomas Raymond VOGT, Real Party in Interest.

No. CV–89–0265–PR.

Supreme Court of Arizona, En Banc.

Oct. 11, 1990.

Stephen D. Neely, Pima County Atty. by Louis M. Spivack, Deputy County Atty., Tucson, for petitioner.

Susan A. Kettlewell, Pima County Public Defender by Creighton Cornell, Asst. Public Defender, Tucson, for real party in interest.

## OPINION

MOELLER, Justice.

### JURISDICTION

After a mistrial in this criminal case, the defendant moved to preclude the state from using the victim's in-court, post-hypnotic identification of defendant. The trial court granted the motion. On special action to the court of appeals, that court reversed and held the post-hypnotic identification admissible. We granted review pursuant to Rule 8(b) Ariz.R.P.Spec. Action § 8, 17B A.R.S., and have jurisdiction pursuant to Ariz. Const. art. 6, § 5(1). After oral argument, we affirmed the trial court's order of exclusion and permitted the trial to proceed, stating that our formal opinion would follow. This is that opinion.

### QUESTION PRESENTED

Whether the trial court properly excluded from evidence the victim's post-hypnotic in-court identification of defendant, where the victim had made no recorded pre-hypnotic identification of the defendant.

### FACTS AND PROCEDURAL HISTORY

On April 8, 1987, the victim was shot in the head during an armed robbery of his jewelry store. While drifting in and out of consciousness in the emergency room, the victim described his assailant as a slender white male, thirty-five to forty years of age, approximately 5'11" tall, with medium-length grey or black hair, and wearing a short-sleeved sports shirt.

Several times in the weeks following the crime, the victim met with Detective Tribble of the Tucson Police Department to discuss the crime and to attempt to describe the assailant. During these discussions, the victim's descriptions varied with respect to the assailant's height, weight, and age. The height varied from a low of 5'5" to as high as the 5'11" estimate given at the emergency room. The weight varied from 160 pounds to 200 pounds. The age ranged from thirty to forty years. The victim, however, consistently described the robber as being clean cut and having short hair. The hair was always described as either dark brown or black. Additionally, the victim maintained that he had a clear picture of the assailant in his mind.

On June 9, 1987, Detective Seng of the Tucson Police Department, who is neither a psychologist nor a psychiatrist, hypnotized the victim using the "TV-technique." The victim was told to "go back" to the day of the crime and to recall the events as if viewing them on a television set.

The victim's sister and Detective Tribble of the Tucson Police Department were also present at the hypnotic session. Kathleen Bright, a forensic artist, came in after the session began. The session was not videotaped. Audio tapes were prepared, which later proved to be partially inaudible. According to Detectives Seng and Tribble, no additional information was obtained as a result of the hypnosis; hence, it was considered a failure. The victim did state under hypnosis that the person who robbed him was a slender, thirty-year-old white male, 180 to 185 pounds, 5'9" to 5'10" tall, with brown hair, wearing a sports jacket. Immediately after hypnosis, the victim worked with Ms. Bright, the forensic artist, in the preparation of a composite sketch of the person described under hypnosis.

In August 1987, defendant was arrested in Iowa on unrelated charges. Because information obtained from independent sources implicated the defendant in the Tucson robbery, the victim was shown a series of "mug shots," one of which was the defendant's. The victim did not identify the defendant.

Defendant was indicted for the Tucson crime and on March 2, 1989, nearly twenty-one months after he had been hypnotized, the victim began his testimony before the trial jury. Much to the surprise of counsel for both the defense and the state, the victim proceeded to identify the defendant as his assailant. Defense counsel moved for a mistrial on the grounds that the in-court identification was inadmissible. After a hearing outside the presence of the jury, the trial court declared a mistrial. The state then sought special action relief in the court of appeals. Although the

court of appeals declined to accept jurisdiction of the special action because it determined that the order for mistrial was within the trial court's discretion, it nevertheless proceeded to "hold" that the in-court identification was admissible because it was not tainted by the hypnosis.

Defendant then filed a motion in the trial court to preclude "all testimony by the victim concerning any memory of events occurring after June 8, 1989 [the date of the hypnosis]." The trial court concluded that, under the circumstances, it was not bound by the court of appeals' statement that the identification was admissible. The trial court granted the defendant's motion insofar as it sought to preclude the victim from identifying the defendant and also precluded use of the post-hypnotic composite drawing. The later ruling is not challenged here. The state again sought special action relief in the court of appeals. This time the court of appeals accepted jurisdiction and, in a formal opinion, reversed the trial court.

The court of appeals concluded that the trial court's decision was based upon an erroneous interpretation and application of our earlier cases known as *Collins I* and *Collins II.*[1] The court of appeals noted that, under the *Collins* cases, the victim was not *per se* precluded from identifying defendant merely because he had been hypnotized. The court then held that the identification testimony was admissible because the evidence did not show that the identification of the defendant was the result of the hypnosis. It is this ruling with which we disagree.

### DISCUSSION

In the *Collins* cases, several sexual assault victims were hypnotized. The trial court precluded them from testifying. In *Collins I,* we followed *State v. Mena,* 128 Ariz. 226, 624 P.2d 1274 (1981), and held that the testimony of a hypnotized witness

was *per se* inadmissible and that a hypnotized witness was incompetent to testify concerning any matter that was the subject of the hypnotic session, including matters recalled before hypnosis. *Collins I,* 132 Ariz. at 189, 644 P.2d at 1275. In *Mena,* we said that "until hypnosis gains general acceptance in the fields of medicine and psychiatry as a method by which memories are accurately improved without undue danger of distortion, delusion or fantasy, we feel that testimony of witnesses which has been tainted by hypnosis should be excluded in criminal cases." 128 Ariz. at 231, 624 P.2d at 1279. *Collins I* reaffirmed *Mena.*

On rehearing in *Collins II,* we addressed the question whether a hypnotized witness is competent to testify concerning matters demonstrably recalled prior to hypnosis. Applying the *Frye* test,[2] we reaffirmed our prior position "that hypnosis has not received sufficient general acceptance in the scientific community to give reasonable assurance that the benefit of the results produced under even the best of circumstances will be sufficiently reliable to outweigh the risks of abuse or prejudice." *Collins II,* 132 Ariz. at 201, 644 P.2d at 1287. However, a reading of the four opinions filed following rehearing indicates that the majority of the court favored modification of *Collins I.* As modified, our holding was that a witness is not rendered incompetent merely because of hypnosis. Rather, the witness is permitted to testify regarding matters recalled and related before hypnosis. *Id.* at 209, 644 P.2d at 1285 (Feldman, J., opinion of the court); *see State v. McMurtrey,* 136 Ariz. 93, 99, 664 P.2d 637, 643, *cert. denied,* 464 U.S. 858, 104 S.Ct. 180, 78 L.Ed.2d 161 (1983). We noted that "there are few dangers so great in the search for truth as man's propensity to tamper with the memory of others." *Collins II,* 132 Ariz. at 210, 644 P.2d at 1286. *Collins II* intended to elucidate a bright

---

1. *State ex rel. Collins v. Superior Court,* 132 Ariz. 180, 644 P.2d 1266 [*Collins I*], *supplemental opinion on rehearing,* 132 Ariz. at 193, 644 P.2d at 1279 (1982) [*Collins II*].

2. The *Frye* test inquires whether the scientific principle or method used is sufficiently established to have gained general acceptance in the particular field in which it belongs. *Frye v. United States,* 293 F. 1013, 1014 (D.C.Cir.1923).

line rule: post-hypnotic recall is inadmissible, but pre-hypnotic recall is admissible provided it has been recorded prior to hypnosis. *Id.* at 208–10, 644 P.2d at 1284–86; *State v. Young*, 135 Ariz. 437, 439, 661 P.2d 1138, 1140 (Ct.App.1982), *cert. denied*, 464 U.S. 866, 104 S.Ct. 197, 78 L.Ed.2d 172 (1983). This ruling was intended to protect against possibly tainted testimony, while preserving the use of hypnosis as an investigative tool.

In the instant case, the court of appeals concluded that the identification testimony was admissible because no evidence indicated that the victim's memory had, in fact, been tampered with, nor did any evidence show that the victim was confabulating or lying. "In fact," the court of appeals reasoned, "it was impossible for the authorities to have influenced [the victim's] memory in any manner so as to implicate [defendant] as the perpetrator of the crimes because [the victim] was hypnotized in June of 1987 and [defendant] did not become a suspect until August of that year." *State v. Sherrill*, 162 Ariz. 164, 167, 781 P.2d 642, 645 (Ct.App.1989). Consequently, the court of appeals reasoned, the trial court must have drawn one of two erroneous conclusions: (1) a hypnotized victim is, *per se*, precluded from identifying defendant; or (2) the victim's ability to identify defendant in this case was the result of the hypnosis and was, therefore, precluded by *Collins II*. *Id.* Because the court of appeals believed both conclusions to be erroneous, it reversed the trial court. We disagree with the court of appeals' analysis and with its reading of *Collins II*.

This court in *Collins II* noted several dangers inherent in the use of hypnosis. Other courts have made similar observations. Among those dangers are the following:

(1) The subject under hypnosis is extremely susceptible to suggestions given intentionally or unintentionally by the hypnotist or others present during the session. The source of suggestions could be verbal or nonverbal cues given by the hypnotist of which even the hypnotist is unaware. *Collins II*, 132 Ariz. at 201, 644 P.2d at 1277;

*Little v. Armontrout*, 819 F.2d 1425, 1429 (8th Cir.1987), *on rehearing*, 835 F.2d 1240, *cert. denied*, 487 U.S. 1210, 108 S.Ct. 2857, 101 L.Ed.2d 894 (1988); *People v. Shirley*, 31 Cal.3d 18, 181 Cal.Rptr. 243, 274, 723 P.2d 1354, 1384, *cert. denied*, 458 U.S. 1125, 103 S.Ct. 13, 73 L.Ed.2d 1400 (1982); *State v. Hurd*, 86 N.J. 525, 432 A.2d 86, 93 (1981).

(2) The subject is likely to confabulate by filling in details of memory gaps to make his account of events more logical, complete, and acceptable. *Collins II*, 132 Ariz. at 201, 644 P.2d at 1277; *Clay v. Vose*, 599 F.Supp. 1505, 1518 (Mass.Dist.1984), *aff'd*, 771 F.2d 1 (1st Cir.1985), *cert. denied*, 475 U.S. 1022, 106 S.Ct. 1212, 89 L.Ed.2d 324 (1986); *Harker v. Maryland*, 800 F.2d 437, 440 (4th Cir.1986). Additionally, it is impossible for either the subject or a hypnosis expert to determine whether a given piece of information is actual memory or confabulation, absent independent verification such as a record of the subject's pre-hypnotic recall. *Little*, 819 F.2d at 1430.

(3) The subject may confound memories evoked under hypnosis with prior recall. Thus, it becomes impossible to distinguish between memories of impressions existing before hypnosis and memories of impressions generated during hypnosis. *Commonwealth v. Kater*, 388 Mass. 519, 447 N.E.2d 1190, 1196 (1983); *State v. Hurd*, 432 A.2d at 93–94.

(4) The subject of hypnosis develops a distorting desire to please the hypnotist. *United States v. Valdez*, 722 F.2d 1196, 1201 (5th Cir.1984); *Commonwealth v. Nazarovitch*, 496 Pa. 97, 436 A.2d 170, 174 (1981); *Shirley*, 181 Cal.Rptr. at 270–71, 723 P.2d at 1380–81.

(5) The subject of hypnosis generally becomes absolutely confident in the accuracy of his recall, thereby unfairly impairing effective cross-examination of the subject about the event. *Collins II*, 132 Ariz. at 201, 644 P.2d at 1277; *People v. Hults*, 76 N.Y.2d 190, 557 N.Y.S.2d 270, 556 N.E.2d 1077 (1990); *Clay*, 599 F.Supp. at 1519.

(6) The subject loses critical judgment because he is willing to speculate and then

give credence to such speculation. *Hurd*, 432 A.2d at 93; *Little*, 819 F.2d at 1430.

In *Collins II*, we joined several courts in declining to adopt a set of safeguards to protect against the risks inherent in using post-hypnotic testimony. Our main concern was that a case-by-case determination under any such set of safeguards "will consume too much in the way of judicial resources, will produce conflicting results in trial courts, and will produce few situations in which hypnotic recall testimony is ever admitted." *Collins II*, 132 Ariz. at 208, 644 P.2d at 1284. Furthermore, we quoted with approval from the California case of *People v. Shirley:*

> There would first be elaborate demands for discovery, parades of expert witnesses, and special pretrial hearings, all with concomitant delays and expense. Among the questions our trial courts would then be expected to answer are scientific issues so subtle as to confound the experts.... Their resolution would in turn generate a panoply of new claims that could be raised on appeal.... And because the hypnotized subject would frequently be the victim, the eyewitness, or a similar source of crucial testimony against the defendant, any errors in ruling on the admissibility of such testimony could easily jeopardize otherwise unimpeachable judgments of conviction. In our opinion, the game is not worth the candle.

*Id.* (quoting *Shirley*), 181 Cal.Rptr. at 255, 723 P.2d at 1365.

The case before us presents a good example of the type of problems we sought to avoid in *Collins II*. Defendant retained an expert in psychology and hypnosis to review the hypnotic session. After the court of appeals remanded this case to the trial court, defendant's expert testified for two hours at an evidentiary hearing and provided a written evaluation of the hypnotic session. His opinion was that the hypnotic session was tainted by pre-hypnotic and post-hypnotic suggestions, that the hypnotist failed to limit who could "cue" hypnotic suggestions, that the hypnotist set no time limitation as to the hypnotic suggestions, that the victim no longer had his own memory of what happened on the day he was shot, and that the victim's recall had been contaminated and destroyed by the hypnotic session. The state then retained an expert who contested the findings of the defendant's expert. Defendant then attempted to use yet another expert, but the trial court denied that request. There have already been four pre-trial special actions to appellate courts arising from the hypnotic session.[3] *Collins II* elucidated a rule that was designed to avoid this type of delay and consumption of court resources. *Collins II* permits the use of hypnosis in the investigatory phase, but a hypnotized witness is only permitted to testify to those facts *demonstrably recalled* before hypnosis.

To assure that only "demonstrably recalled" prehypnotic testimony is used, we stated in *Collins II:*

> We further minimize the risk by requiring that before hypnotizing a potential witness for investigatory purposes, the party intending to offer the prehypnotic recall appropriately record in written, tape recorded or, preferably, videotaped form the substance of the witness' knowledge and recollection about the evidence in question so that the prehypnotic recall may be established. Such recordation must be preserved so that at trial the testimony of that witness can be limited to the prehypnotic recall. If such steps are not taken, admission of the prehypnotic recall will be error, which, if prejudicial, will require reversal.

*Collins II*, 132 Ariz. at 210, 644 P.2d at 1296.

Although courts have approached the problem of hypnosis differently,[4] our position, as expressed in *Collins II*, has gained wide support and has been described as the

---

**3.** In addition to the two described in this opinion, *see Vogt v. Sherrill*, CV–90–0139–PR (filed Apr. 12, 1990); *Vogt v. Sherrill*, CV–90–0019–PR (filed Jan. 12, 1990).

**4.** For an extensive review of the different schools of thought on this issue see *Collins II*, 132 Ariz. at 204, 644 P.2d at 1280; *Little*, 819 F.2d at 1431–32; *Clay*, 599 F.Supp. at 1519.

"emerging consensus." *People v. Hughes,* 59 N.Y.2d 523, 466 N.Y.S.2d 255, 263, 453 N.E.2d 484, 492 (1983); *see also Valdez,* 722 F.2d at 1204 n. 37 and cases cited therein. The state does not present us with any new scientific evidence contesting the inherent unreliability of hypnotically induced testimony. Neither does it present us with any new arguments compelling us to re-examine the validity of *Collins II.* Rather, the state argues that the victim's identification of defendant at trial was not induced by hypnosis; therefore, no causal connection exists between the hypnotic session and the in-court identification.

However, the very premise of *Collins II* is that it is difficult, if not impossible, to ascertain exactly which testimony or recall has been influenced by the state of suggestability induced by hypnosis. We adhere to our holding in *Collins II* that post-hypnotic testimony must have been demonstrably recalled and recorded prior to hypnosis in order to be admissible. Thus, the trial court properly excluded the victim's in-court identification in this case.

## CONCLUSION

We reaffirm our holding in *Collins II.* The trial court order precluding the in-court identification is affirmed. The court of appeals' opinion is vacated.

FELDMAN, V.C.J., and CAMERON and CORCORAN, JJ., concur.

GORDON, Chief Justice, specially concurring in part and dissenting in part:

I concur with the result reached by the majority, which affirmed the trial court's order precluding the in-court identification in this case. However, I write separately because I cannot concur with the majority's reaffirmation of the holding in *Collins II.*

In *Collins I,* a majority of this court held that post-hypnotic testimony is per se inadmissible in a criminal trial, and that any previously hypnotized witness is incompetent to testify. 132 Ariz. at 189–90, 644 P.2d at 1275–76. Two justices dissented. After a reconstitution of the court by the retirement and replacement of one justice,

the court in a supplemental opinion (*Collins II*) modified the original opinion. The new majority in *Collins II* reaffirmed the principle that hypnotically induced recall testimony is inadmissible, 132 Ariz. at 201, 208, 644 P.2d at 1287, 1294, but held that a witness is competent to testify to matters that he "was able to recall *and* relate prior to hypnosis," 132 Ariz. at 209, 644 P.2d at 1295.

I wrote separately in *Collins II* to dissent from the court's modification of the original opinion. Because of its "obvious flaws," I objected to the new rule "giving the witness the right to say on the witness stand what was remembered before being hypnotized." *Collins II,* 132 Ariz. at 211, 644 P.2d at 1297. I was especially concerned about the potential violation of a defendant's constitutional right to an effective cross-examination. *Id.* at 212, 644 P.2d at 1298. I will spare the readers any further reiteration of the concerns I expressed in *Collins II.* It suffices to say that the same dangers exist today.

The majority today reaffirms the "bright line rule" *Collins II* intended to elucidate: "post-hypnotic recall is inadmissible, but pre-hypnotic recall is admissible provided it has been recorded prior to hypnosis." Majority op. at 510–511, 512, 799 P.2d at 851–852, 853 (citations omitted). I must dissent because the majority has drawn its bright line in the wrong place. I would hold that testimony by a previously hypnotized witness is *per se* inadmissible, and that such a witness is incompetent to testify concerning *any* matter that was the subject of a hypnotic session, even a matter demonstrably recalled and related prior to hypnosis.